UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA              :

           - v. -                        :        S4 12 Cr. 174 (WHP)

KENTON RUSSELL and                    :
DWAYNE THOMAS,
  a/k/a "Dwight,"                    :
  a/k/a "D,"
  a/k/a "Speng,"                     :

             Defendants.           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S POST-HEARING BRIEF IN OPPOSITION TO THE DEFENDANTS' MOTIONS TO SUPPRESS IDENTIFICATION EVIDENCE

PREET BHARARA
United States Attorney for the
Southern District of New York,
Attorney for the United States
    of America

Rachel Maimin
Telemachus P. Kasulis
Assistant United States Attorneys
   - Of Counsel -

# TABLE OF CONTENTS

I.  Procedural Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  Relevant Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.  Mr. Jean Jacques's Identification of the Defendants. . . . . . . . . . . . . . . . . . . . . 2

        1.  The January 12, 2012 Home Invasion. . . . . . . . . . . . . . . . . . . . . . . . . . 2

            a.  Mr. Jean Jacques's Home. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

            b.  Mr. Jean Jacques Attempts to Leave His Home. . . . . . . . . . . . . . 3

            c.  Mr. Jean Jacques is Held Up at Gunpoint. . . . . . . . . . . . . . . . . . 3

            d.  The Defendants Force Mr. Jean Jacques Up the Stairs. . . . . . . . . . 4

            e.  The Defendants Demand Mr. Jean Jacques's Keys and
               Unlock the Door to the Home. . . . . . . . . . . . . . . . . . . . . . . . . . 4

            f.  The Defendants Force Mr. Jean Jacques into the Room. . . . . . . . . 5

            g.  Thomas Steals Mr. Jean Jacques's Possessions While
               Russell Holds Mr. Jean Jacques Down at Gunpoint. . . . . . . . . . . 5

        2.  Mr. Jean Jacques's Description of the Defendants on the Day of the
           January 12, 2012 Home Invasion.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        3.  Mr. Jean Jacques's Identification of the Defendants on January 18,
           2012. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    B.  Ms. Maitland's Identification of the Defendants. . . . . . . . . . . . . . . . . . . . . . . 8

        1.  The Defendants Go to Ms. Maitland's Residence. . . . . . . . . . . . . . . . . 8

        2.  The Phones Are Traced. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        3.  Ms. Maitland is Interviewed. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

III.  Applicable Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

IV.  Discussion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

A.  The Defendants' Motion to Suppress Mr. Jean Jacques's Identification
    Should Be Denied. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    1.  The Witness's Opportunity to View the Defendants. . . . . . . . . . . . . . . 13

    2.  The Degree of the Witness's Attention. . . . . . . . . . . . . . . . . . . . . . . . . 15

    3.  The Accuracy of the Witness's Prior Description. . . . . . . . . . . . . . . . . 16

    4.  The Degree of Certainty Demonstrated By the Witness at the
        Improper Confrontation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    5.  The Length of Time Between the Crime and the Confrontation. . . . . . . 18

B.  The Defendants' Motions to Suppress Ms. Maitland's Identification
    Should Be Denied. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    1.  Ms. Maitland's Identification Was Not Unduly Suggestive. . . . . . . . . . 19

    2.  Ms. Maitland's Identification of the Defendants Passes the *Biggers*
        Test.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        a.  The Witness's Opportunity to View the Defendants and the
            Degree of the Witness's Attention. . . . . . . . . . . . . . . . . . . . . . . 21

        b.  The Accuracy of the Witness's Prior Description. . . . . . . . . . . . 22

        c.  The Degree of Certainty Demonstrated by the Witness at
            the Improper Confrontation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        d.  The Length of Time Between the Crime and the
            Confrontation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

V.  Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

          - v. -          :          S4 12 Cr. 174 (WHP)

KENTON RUSSELL and          :
DWAYNE THOMAS,
   a/k/a "Dwight,"          :
   a/k/a "D,"
   a/k/a "Speng,"          :

          Defendants.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S POST-HEARING BRIEF IN OPPOSITION TO THE DEFENDANTS' MOTIONS TO SUPPRESS IDENTIFICATION EVIDENCE

The Government respectfully submits this post-hearing brief in opposition to the defendants' motions to suppress identification evidence. The defendants seek to suppress the identification of the defendants by (a) Blundy Jean Jacques, one of the victims of the armed home invasion charged in Count Three of the Indictment (the "January 12, 2012 Home Invasion"); and (b) Monique Maitland, who saw the defendants together on or about the date of the January 12, 2012 Home Invasion. As set forth below, the evidence adduced at the hearing establishes that the defendants' motions should be denied.

## I.     Procedural Background

The Court held a hearing regarding Mr. Jean Jacques's and Ms. Maitland's identifications of the defendants, pursuant to *United States* v. *Wade*, 388 U.S. 218 (1967), on September 11, 2012 and September 24, 2012. On September 11, 2012, Detective Elaine Jenkins of the New

York City Police Department (the "NYPD") testified, and Mr. Jean Jacques and Ms. Maitland

testified on September 24, 2012.

## II.     Relevant Facts

### A.     Mr. Jean Jacques's Identification of the Defendants

#### 1.     The January 12, 2012 Home Invasion

##### a.     Mr. Jean Jacques's Home

On January 12, 2012, Mr. Jean Jacques was at home, at 4338 Boyd Avenue in the Bronx

(the "Home"). (September 24, 2012 Hearing Transcript ("Sept. 24 Tr.") 8-9.)  The Home is a

private house, but different individuals, and a family, live there as roommates. (Sept. 24 Tr. 8;

*see also* September 11, 2012 Hearing Transcript ("Sept. 11 Tr.") 10.)  There is a common area

and a kitchen.  (Sept. 24 Tr. 8.)  The Home has two entrances: a front door and a back door.

(Sept. 24 Tr. 9.)  The back door is lit by a light and, on January 12, 2012, it was on during the

period relevant to these motions.  (Sept. 24 Tr. 10; Sept. 11 Tr. 10-11.)  When one exits the back

door of the Home, there is a set of approximately six or seven stairs, and a driveway to the right.

(Sept. 24 Tr. 10.)

Entering the Home from the back entrance, one encounters a common area, namely, a

hallway (the "Hallway") between the kitchen and Mr. Jean Jacques's room (the "Room"). (Sept.

24 Tr. 13; Sept. 11 Tr. 11)  The kitchen has a light, which was also on during the period at issue.

(Sept. 24 Tr. 13; Sept. 11 Tr. 11.)

The Room is a small area and contains a number of pieces of furniture, including dressers

and a bed.  (Sept. 24 Tr. 14.)  On January 12, 2012, the Room was lit by the light from Mr. Jean

Jacques's television and an iPad.  (Sept. 24 Tr. 14.)

2

### b.  Mr. Jean Jacques Attempts to Leave His Home

On January 12, 2012, Mr. Jean Jacques was at the Home with his cousin, Albert Remmy. (Sept. 24 Tr. 9.)  In the evening, Mr. Jean Jacques attempted to leave the Home to do laundry at a laundromat down the block.  (Sept. 24 Tr. 9.)  When Mr. Jean Jacques left the Room, Mr. Remmy was playing on the floor with an iPad.  (Sept. 24 Tr. 9.)

Mr. Jean Jacques left the Home through the back door, and went down the stairs.  (Sept. 24 Tr. 10.)

### c.  Mr. Jean Jacques is Held Up at Gunpoint

When Mr. Jean Jacques got to the bottom of the stairs, he was held up by two men with guns.  (Sept. 24 Tr. 10.)  One of the men was shorter, and one was skinnier and taller, with braids.  (Sept. 24 Tr. 10.)  The taller man with braids - later identified by Mr. Jean Jacques as the defendant, Dwayne Thomas - had one gun.  (Sept. 24 Tr. 11.)  The shorter man - later identified by Mr. Jean Jacques as the defendant, Kenton Russell - had two guns.  (Sept. 24 Tr. 11.)  The defendants were close to Mr. Jean Jacques; they were "right up on" him.  (Sept. 24 Tr. 12.)  Neither of the defendants wore masks. (Sept. 24 Tr. 11; Sept. 11 Tr. 11.) Mr. Jean Jacques had not seen either of them before.  (Sept. 24 Tr. 11.)

Mr. Jean Jacques saw additional men in the driveway, but that area was dark, and he could not see how many people there were.  (Sept. 24 Tr. 11.)  Unlike the defendants, those individuals did not approach Mr. Jean Jacques. (Sept. 24 Tr. 11.)

3

### d.    The Defendants Force Mr. Jean Jacques Up the Stairs

The defendants forced Mr. Jean Jacques back up the steps towards the back door of the Home.  (Sept. 24 Tr. 12.)  It took about ten seconds to get up the steps.  (Sept. 24 Tr. 39.)

Prior to their ascent, Thomas had a gun to the back of Mr. Jean Jacques's head.  (Sept. 24 Tr. 12.)  But, then, Thomas switched positions and went up the stairs first, in front of Mr. Jean Jacques.  (Sept. 24 Tr. 12.)  While the defendants were switching positions, both of the defendants were in front of Mr. Jean Jacques.  (Sept. 24 Tr. 37.)  During the walk up the steps, Thomas was angled sideways - towards Mr. Jean Jacques - looking at Mr. Jean Jacques for part of the time.  (Sept. 24 Tr. 39.)

Mr. Jean Jacques was looking at Russell and Thomas during the walk up the steps.  (Sept. 24 Tr. 12.)  The defendants repeatedly asked Mr. Jean Jacques: "Who is in the house?  Who is in the house?"  (Sept. 24 Tr. 12.)

### e.    The Defendants Demand Mr. Jean Jacques's Keys and Unlock the Door to the Home

At the top of the steps, the defendants stood directly under the back door's light, and Mr. Jean Jacques looked at the defendants' faces.  (Sept. 24 Tr. 13.)  Indeed, Mr. Jean Jacques got a "perfect" look at the defendants' faces under that light, as the defendants asked Mr. Jean Jacques, again, who was in the Home, and as Mr. Jean Jacques found his key.  (Sept. 24 Tr. 50.)  Thomas took the key from Mr. Jean Jacques, opened the door, and went inside.  (Sept. 24 Tr. 13.)

Mr. Jean Jacques was outside with the defendants for about one or two minutes.  (Sept. 24 Tr. 18.)

4

**f.      The Defendants Force Mr. Jean Jacques into the Room**

After entering the Home through the backdoor, the defendants forced Mr. Jean Jacques

through the Hallway towards the Room.  (Sept. 24 Tr. 13.)  Because of the light in the kitchen,

Mr. Jean Jacques's sight was "clear."  (Sept. 24 Tr. 13.)  Mr. Jean Jacques saw the defendants'

faces again as they passed through the Hallway.

**g.      Thomas Steals Mr. Jean Jacques's Possessions While Russell
          Holds Mr. Jean Jacques Down at Gunpoint**

Thomas ran into the Room first.  (Sept. 24 Tr. 13.)  Thomas "got over [Mr. Remmy's]

head" and ordered Mr. Remmy, who was still lying on the floor with the iPod, to stay down.

(Sept. 24 Tr. 14.)  Russell shoved Mr. Jean Jacques and told him to sit down on the floor.  (Sept.

24 Tr. 13.)  Russell had put one of his guns away, but kept the other one out, standing directly

over Mr. Jean Jacques, and facing him, for about three or four minutes.  (Sept. 24 Tr. 14-15, 23.)

In the meantime, from less than six feet away from Mr. Jean Jacques, Thomas pulled out Mr.

Jean Jacques's drawers, and collected things from the Room. (Sept. 24 Tr. 15-16.)

Thomas told Russell to leave and said: "I'll burn this boy," which Mr. Jean Jacques

understood to mean: "I'll shoot them."  (Sept. 24 Tr. 15.)  A short time after Russell left, Thomas

departed as well. (Sept. 24 Tr. 15.)

Mr. Jean Jacques estimates that the defendants were in the Home for a little over five

minutes.  (Sept. 24 Tr. 24.)

### 2.   Mr. Jean Jacques's Description of the Defendants on the Day of the January 12, 2012 Home Invasion

That same day, Detective Jenkins interviewed Mr. Jean Jacques about what had happened during the January 12, 2012 Home Invasion.  (Sept. 11 Tr. 10.)  Mr. Jean Jacques told Detective Jenkins that the robbers were male blacks in their 20s.  (Sept. 11 Tr. 13.)  Mr. Jean Jacques provided the following description to Detective Jenkins of Russell: "male black, 20s, five-seven, 140 pounds, dark-skinned, black hoodie, and bluejeans. Had a black revolver and a black semiautomatic handgun."  (Sept. 11 Tr. 14.)  Mr. Jean Jacques provided the following description to Detective Jenkins of Thomas: "male black, 20s, five nine to five ten, 160 pounds, medium skinned, braids, cornrows, black jacket, bluejeans, and a black semiautomatic handgun." (Sept. 11 Tr. 14.)  Mr. Jean Jacques also told Detective Jenkins that the robbers were not wearing masks.  (Sept. 11 Tr. 11.)

### 3.   Mr. Jean Jacques's Identification of the Defendants on January 18, 2012

On January 18, 2012, Mr. Jean Jacques met with Detective Jenkins at her precinct.  (Sept. 24 Tr. 16.)  Before the meeting, Detective Jenkins had called Mr. Jean Jacques to tell him that he would be looking at pictures in order to identify the people who had robbed him.  (Sept. 24 Tr. 16.)  Detective Jenkins intended to show Mr. Jean Jacques pictures of suspects on the NYPD's "Photo Manager" System, which is a New York State mug shot database. (Sept. 11 Tr. 15.) Before the meeting, Detective Jenkins's supervisor had provided Detective Jenkins with photographs of the defendants because they fit the description of the perpetrators of the January 12, 2012 Home Invasion.  (Sept. 11 Tr. 16-17.) However, Detective Jenkins had not yet done any

investigation of the defendants before meeting with Mr. Jean Jacques on January 18, 2012. (Sept. 11 Tr. 17.)

When Mr. Jean Jacques was waiting for Detective Jenkins for their meeting at the precinct, he saw that she was carrying papers. (Sept. 24 Tr. 16-17.) Mr. Jean Jacques then saw, among the papers, a photograph of the taller man with braids who had robbed him. (Sept. 24 Tr. 17.) That was a photograph of Thomas. (Sept. 11 Tr. 18; *see* Government Exh. 1.) Mr. Jean Jacques "[a]lmost immediately" said to Detective Jenkins: "Jenkins, that's the guy right there." (Sept. 24 Tr. 17; *see also* Sept. 11 Tr. 19.) Mr. Jean Jacques had been "100 percent sure" that this photograph, *i.e.,* the picture of Thomas, depicted the taller man with the braids who had robbed him at gunpoint. (Sept. 24 Tr. 17; *see* Sept. 11 Tr. 20.)

Detective Jenkins then showed Mr. Jean Jacques a second photograph - a picture of Russell. (Sept. 24 Tr. 17; Sept. 11 Tr. 20; Government Exh. 2.) When Mr. Jean Jacques saw the second photograph, he said to Detective Jenkins: "[t]hat's both of them." (Sept. 24 Tr. 17; *see also* Sept. 11 Tr. 21.) Again, Mr. Jean Jacques had been "100 percent sure" that this second photograph, *i.e.,* the picture of Russell, depicted the shorter man who had pointed two guns at him during the robbery. (Sept. 24 Tr. 17; *see* Sept. 11 Tr. 21)

Before Mr. Jean Jacques saw the two photographs, Detective Jenkins did not say anything to him about the men depicted in them. (Sept. 24 Tr. 18.) In addition, she did not say anything to him after showing him the first photograph, *i.e.,* the picture of Thomas. (Sept. 24 Tr. 26.)

### B.      Ms. Maitland's Identification of the Defendants

#### 1.      The Defendants Go to Ms. Maitland's Residence

On an occasion prior to January 18, 2012, approximately 10 men went to Ms. Maitland's residence on Furman Avenue in the Bronx (the "Furman Avenue Residence"). (Sept. 24 Tr. 53.)

When the men arrived, Ms. Maitland was sitting in her living room, which is "not that big," on the computer. (Sept. 24 Tr. 54, 68.) Ms. Maitland recognized two of the men. (Sept. 24 Tr. 55.) She recognized one of them as "Dwight," whom she had seen more than once, when they had "s[a]t and talk[ed]." (Sept. 24 Tr. 57.) She recognized one of them as Dwight's friend, whom she had seen one or two prior times with Dwight. (Sept. 24 Tr. 57.) Ms. Maitland said hello to the two men, and they said hello back. (Sept. 24 Tr. 58-59.) After the 10 men left, Ms. Maitland saw that two cellphones had been left at the Furman Avenue Residence. (Sept. 24 Tr. 53-54, 58.)

#### 2.      The Phones Are Traced

On January 18, 2012, using GPS technology, the police traced one of the cellphones stolen from Mr. Jean Jacques during the January 12, 2012 Home Invasion to the Furman Avenue Residence. (Sept. 11 Tr. 22-23; Sept. 24 Tr. 52.) That day, Detective Jenkins went to the Furman Avenue Residence, and found the two stolen phones. (Sept. 11 Tr. 23.)

#### 3.      Ms. Maitland is Interviewed

At the Furman Avenue Residence, Detective Jenkins interviewed Ms. Maitland. (Sept. 11 Tr. 24-25; Sept. 24 Tr. 59-62.) Ms. Maitland made a written statement that: "My mother friend Dwight came by and left two phones. And my sister started using one of them . . . so I

8

turned of[f] the other one and put it away."  (Government Exh. 3; Sept. 24 Tr. 61-62.)  "Dwight"

is an alias of Thomas's.  (Sept. 11 Tr. 25.)

Detective Jenkins showed Ms. Maitland photographs of Russell and Thomas.  (Sept. 11

Tr. 26-28; Sept. 24 Tr. 59-61; Government Exhs. 1, 2.)  Ms. Maitland identified Thomas as

"Dwight," the man that she had seen the night the cell phones were brought to her house. (Sept.

24 Tr. 59).  Ms. Maitland, who "immediately" pointed to Thomas's picture, (Sept. 11 Tr. 27),

was "sure" that the picture of Thomas - or "Dwight," as Ms. Maitland knew him - depicted the

person who had been to the Furman Avenue Residence that night, because she had "seen him

before, so that's why [she] kn[e]w it was him . . . sure enough to know that that's him in the

picture."  (Sept. 24 Tr. 59-60).  Ms. Maitland identified Russell as the other man she saw the

night the ten men came to her house with the two cellphones.  (Sept. 24 Tr. 60-61.)[1]

## III.   Applicable Law

Identification evidence is subject to suppression only if the procedure used in connection

with the identification was "so unnecessarily suggestive and conducive to irreparable mistaken

identification that [the defendant] was denied due process of law."  *Stovall* v. *Denno*, 388 U.S.

293, 302 (1967), *abrogated on other grounds*, *Griffith* v. *Kentucky*, 479 U.S. 314 (1987); *United

States* v. *Jakobetz*, 955 F.2d 786, 803 (2d Cir. 1992).  That standard is met only if there is "a very

substantial likelihood of *irreparable* misidentification."  *Simmons* v. *United States*, 390 U.S. 377,

384 (1968) (emphasis added); *Manson* v. *Brathwaite*, 432 U.S. 98, 116 (1977).  Short of that,

---

[1]       On cross examination, Ms. Maitland said that she was not sure whether Russell
was with Thomas on the night Thomas brought the cellphones to the Furman Avenue Residence.
(Sept. 24 Tr. 67.)  She was not uncertain about having seen Thomas with Russell on multiple
previous occasions, however.  (Sept. 24 Tr. 57-58, 60-61.)

identification evidence, even if it has some element of untrustworthiness, is for the jury to weigh

and credit or discredit. *Manson*, 432 U.S. at 116; *see also Watkins* v. *Sowders*, 449 U.S. 341,

347-48 (1981).

> As the Supreme Court has explained:

> > We are content to rely upon the good sense and judgment of
> > American juries, for evidence with some element of
> > untrustworthiness is customary grist for the jury mill. Juries are not
> > so susceptible that they cannot measure intelligently the weight of
> > identification testimony that has some questionable feature.

*Manson*, 432 U.S. at 116.

> Similarly:

> > Where identification evidence is at issue . . . no . . . special
> > considerations justify a departure from the presumption that juries
> > will follow instructions. It is the reliability of identification
> > evidence that primarily determines its admissibility[.] And the
> > proper evaluation of evidence under the instructions of the trial
> > judge is the very task our system must assume juries can perform.

*Watkins* v. *Sowders*, 449 U.S.  at 347 (1981) (citations omitted); *see, e.g., United States* v.

*Fofanah*, No. 11 Cr. 721 (JFK), 2012 WL 2674220, at *3 (S.D.N.Y. July 5, 2012) ("The Court

also notes that the Defendant's concerns as to the reliability of the out-of-court identification can

be fully explored at trial.").[2]

---

[2]        *Accord, e.g., Manson*, 432 U.S. at 113 n.14 (quoting with approval a concurring
opinion of Judge Leventhal: "'While identification testimony is significant evidence, such
testimony is still only evidence, . . . Counsel can both cross-examine the identification witnesses
and argue in summation as to factors causing doubts as to the accuracy of the identification
including reference to . . . any suggestibility in the identification procedure'"); *Dunnigan* v.
*Keane*, 137 F.3d 117, 129 (2d Cir. 1998) ("Even if the *only* duty of [the] jury in the case is to
assess the reliability of th[e identification] evidence, the information needed for assessment of
reliability can ordinarily be elicited through the time-honored process of cross-examination.")
(internal citations and quotation marks omitted, brackets and emphasis in *Dunnigan*).

10

In *Manson*, the Supreme Court established the two-step analysis to be followed in ruling on the admissibility of identification evidence.  First, the defendant must show that the identification was "so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law."  *United States* v. *DiTommaso*, 817 F.2d 201, 213 (2d Cir. 1987) (quoting *Stovall*, 388 U.S. at 302); *see also United States* v. *Maldonado-Rivera*, 922 F.2d 934, 973 (2d Cir. 1990) (defendant must show identification so unnecessarily suggestive that "in all the circumstances, there is 'a very substantial likelihood of irreparable misidentification'") (quoting *Simmons* v. *United States*, 390 U.S. at 384).  If the defendant cannot make such a showing, "the trial identification testimony is generally admissible without further inquiry into the reliability of the pretrial identification.  In that circumstance, any question as to the reliability of the witness's identifications goes to the weight of the evidence, not its admissibility."  *Maldonado-Rivera*, 922 F.2d at 973.

Even if a court concludes that the identification procedure was unnecessarily suggestive, however, that does not end the inquiry.  *See Brathwaite*, 432 U.S. at 110 (rejecting "per se" approach that would "require[] exclusion of the out-of-court identification evidence, without regard to reliability, whenever it has been obtained through unnecessarily suggested confrontation procedures").  Rather, a second determination must be made: whether the identification evidence is nevertheless independently reliable.  *See id.* at 110-114 ("reliability is the linchpin in determining the admissibility of identification testimony"); *United States* v. *Simmons*, 923 F.2d 934, 950 (2d Cir. 1991).

The determination of whether the identification evidence is independently reliable is based on the totality of the circumstances.  *See id.*, 923 F.2d at 950 (2d Cir. 1991) (even where

11

the procedure is suggestive, district court may still admit the evidence "if, when viewed in the totality of the circumstances, it possesses sufficient indicia of reliability").  The factors relevant to assessing reliability include (1) the witness' opportunity to view the criminal at the time of the crime, (2) the degree of the witness's attention, (3) the accuracy of the witness's prior description of the criminal, (4) the degree of certainty demonstrated by the witness at the improper confrontation, and (5) the length of time between the crime and the confrontation.  *See Neil* v. *Biggers*, 409 U.S. 188, 199-200 (1972).  Because the factors must be assessed in light of the totality of the circumstances, "[a] good or poor rating with respect to any one of [the identification] factors will generally not be dispositive."  *United States* v. *Concepcion*, 983 F.2d 369, 377 (2d Cir. 1992).

## IV.     Discussion

### A.     The Defendants' Motion to Suppress Mr. Jean Jacques's Identification Should Be Denied

As set forth below, the evidence at the hearing demonstrated that Mr. Jean Jacques's identification of the defendants was independently reliable under *Biggers*.  Thus, the defendants' motions to suppress this identification should be denied.  The Government should be permitted to introduce into evidence Mr. Jean Jacques's pretrial identification of the defendants, and Mr. Jean Jacques should be permitted to make an in-court identification of the defendants at trial.

#### 1.     The Witness's Opportunity to View the Defendants

With respect to the first *Biggers* factor - the witness's opportunity to view the criminals at the time of the crime - Mr. Jean Jacques had ample time to observe both defendants during the January 12, 2012 Home Invasion, at close range, and in good lighting.  Indeed, there were five

discrete periods during the January 12, 2012 Home Invasion that provided independently

sufficient bases for Mr. Jean Jacques to observe both Thomas and Russell:

- *When Mr. Jean Jacques first saw the defendants at the base of the stairs*: When Mr. Jean Jacques first saw Russell, pointing two guns at him, and Thomas, pointing one gun at him, the defendants were "right up on" Mr. Jean Jacques at the base of the stairs, which were illuminated by a light at the door. (Sept. 24 Tr. 10-12.) Neither of the defendants wore masks. (Sept. 24 Tr. 11.)

- *When the defendants forced Mr. Jean Jacques up the stairs*: It took about 10 seconds for Russell and Thomas to force Mr. Jean Jacques back up the stairs. (Sept. 24 Tr. 39.) During this period, the defendants switched positions, giving Mr. Jean Jacques an opportunity to view both of them at once, in front of him. (Sept. 24 Tr. 37.) Indeed, Thomas was angled toward Mr. Jean Jacques as Thomas walked, giving Mr. Jean Jacques another opportunity to see Thomas's face. (Sept. 24 Tr. 39.) In any event, Mr. Jean Jacques was looking at both of the defendants as they moved him up the stairs. (Sept. 24 Tr. 12.)

- *When the defendants stood underneath the light by the back door*: After the defendants forced Mr. Jean Jacques up the stairs, the three men paused by the back door. (Sept. 24 Tr. 13.) Thomas and Russell stood directly underneath the back door's light, and Mr. Jean Jacques looked at the defendants right in the face, getting a "perfect" look. (Sept. 24 Tr. 13, 50.)

- *When the defendants forced Mr. Jean Jacques through the Hallway toward the Room*: After forcing Mr. Jean Jacques into the Home, the defendants and Mr. Jean Jacques passed through the Hallway next to the kitchen, which was illuminated by a light. (Sept. 24 Tr. 13.) Mr. Jean Jacques's sight was clear, and he saw the defendants' faces again. (Sept. 24 Tr. 13.)

- *When the defendants were in the Room*: The Room is a small area, and is filled with furniture, including dressers and a bed. (Sept. 24 Tr. 14.) From less than six feet away, aided by light from the television and Mr. Remmy's iPod, Mr. Jean Jacques - who was forced to sit on the floor - saw Mr. Thomas ransacking the Room. (Sept. 24 Tr. 15-16.) All the while, for about three or four minutes, Russell stood directly over Mr. Jean Jacques, facing him, with one gun out. (Sept. 24 Tr. 14-15, 23.)

13

Mr. Jean Jacques, therefore, had several significant opportunities to view both defendants during the January 12, 2012 Home Invasion.[3]  In fact, the Second Circuit has required significantly less quality observation time than Mr. Jean Jacques paid the defendants here. *See, e.g.*, *Manson*, 432 U.S. at 114 (witness identification sufficiently reliable when witness, an undercover police officer, saw the defendant, a drug-dealer for two to three minutes); *Raheem* v. *Kelly*, 257 F.3d 122, 138 (2d Cir. 2001); (witnesses' opportunity to observe the defendant was "good in terms of the duration of the overall encounter" when witnesses, patrons in a bar drinking alcohol and watching television, glanced at a man in the bar over the course of approximately 15 minutes before the man shot the owner); *United States* v. *Wong*, 40 F.3d 1347, 1360 (2d Cir. 1994) (identification independently reliable when made by witness to homicide in restaurant whose attention was fixed on defendant's face on one occasion for two or three seconds); *United States* v. *Salameh*, 152 F.3d 88, 126-27 (2d Cir. 1998) (witness identification sufficiently reliable when witness, a gasoline station attendant, saw defendants and spoke with them as he pumped gas for their car); *United States* v. *Kwong*, 69 F.3d 663, 666 (2d Cir. 1995) (witness identification sufficiently reliable when witness, a postal worker, saw defendant, who was mailing a package, for "four to five minutes"); *United States* v. *Leonardi*, 623 F.2d 746, 755-56 (2d Cir. 1980) (witness identification sufficiently reliable when witness, a motorist in a car, saw defendant, a fleeing robber, for 20-25 seconds — and noting "[t]hat amount of time has been held more than sufficient to render an identification dependable").

---

[3]        By way of contrast, Mr. Remmy was not as fortunate.  Caught off guard by Thomas, he was held on the floor in the Room and did not have the opportunity to view the defendants in the Hallway or outside under the light.  (Sept. 24 Tr. 14.)  Under these circumstances, it is not surprising that he cannot identify the defendants. (*See* Def. Exh. A.)

14

### 2.      The Degree of the Witness's Attention

The second *Biggers* factor - the degree of the witness's attention - also weighs in favor of the reliability of Mr. Jean Jacques's identification.  At each of the five separate occasions described above, Mr. Jean Jacques paid attention to the defendants:

- *When Mr. Jean Jacques first saw the defendants at the base of the stairs*: During this period, when the defendants were "right up on" Mr. Jean Jacques at the base of the stairs, (Sept. 24 Tr. 10-12), he was able to note, among other things, their relative body builds, Thomas's hair style, and the guns they were holding.

- *When the defendants forced Mr. Jean Jacques up the stairs*: During this period, when the defendants switched positions, Mr. Jean Jacques viewed both defendants at once, (Sept. 24 Tr. 37), and observed Thomas's face, as he was angled toward Mr. Jean Jacques. (Sept. 24 Tr. 39.) Indeed, Mr. Jean Jacques looked at both of the defendants as they moved him up the stairs.  (Sept. 24 Tr. 12-13.)

- *When the defendants stood underneath the light by the back door*: During this period, when Thomas and Russell stood directly underneath the back door's light, Mr. Jean Jacques got a "perfect" look at the defendants' faces. (Sept. 24 Tr. 13, 50.)

- *When the defendants forced Mr. Jean Jacques through the Hallway toward the Room*: During this period, Mr. Jean Jacques, again, looked at the defendants' faces, which were illuminated by the light from the kitchen. (Sept. 24 Tr. 13.)

- *When the defendants were in the Room:* During this period, from less than six feet away, Mr. Jean Jacques watched Thomas stealing his things. (Sept. 24 Tr. 15-16.)  At the same time, for about three or four minutes, Russell stood directly over Mr. Jean Jacques, facing him.  (Sept. 24 Tr. 14-15, 23.)

Here, as with the first *Biggers* factor, each of the foregoing occasions presents an independently sufficient basis for the Court to determine that Mr. Jean Jacques paid extremely close attention to the defendants during the course of the robbery.  Mr. Jean Jacques was with the

defendants outdoors for one or two minutes (Sept. 24 Tr. 18); he was with them inside for over

five minutes (Sept. 24 Tr. 24). During this relatively long period, as set forth above, there were

numerous occasions when Mr. Jean Jacques looked directly at the defendants at close range.  Far

from being a passive bystander to a random act on the street, Mr. Jean Jacques had a strong

interest in observing the men robbing him - an interest the Second Circuit recognized in

*Yearwood* v. *Keane*, 101 F.3d 685, 1996 WL 282134 (2d Cir. May 29, 1996) (summary order).

*See Yearwood* 101 F.3d 685 (holding that a robbery victim has a special interest and reason to

pay close attention to his attacker).  This *Biggers* factor demonstrates the reliability of the

identification.

### 3.      The Accuracy of the Witness's Prior Description

This *Biggers* factor - the accuracy of the prior description - likewise supports the

reliability of Mr. Jean Jacques's identification.  The descriptions of the defendants Mr. Jean

Jacques gave in Court were, in substance, the same descriptions he gave to Detective Jenkins on

the day of the January 12, 2012 Home Invasion, and those descriptions accurately describe

Thomas and Russell.

Mr. Jean Jacques told Detective Jenkins[4] that Russell was a "male black, 20s, five-seven,

140 pounds, dark-skinned, [wearing a] black hoodie, and bluejeans[, and h]ad a black revolver

and a black semiautomatic handgun." (Sept. 11 Tr. 14.)  Mr. Jean Jacques told Detective Jenkins

---

[4]      Mr. Jean Jacques testified that Detective Jenkins did not interview him on the date of the January 12, 2012 Home Invasion. (Sept. 24 Tr. 42.)  It is unsurprising that Mr. Jean Jacques could not recall which police officer had interviewed him that evening.  Unlike an occasion where an individual's attention has cause to be strongly focused on a particular person for a reason - say, an armed robbery - a meeting for an interview might well not leave a strong impression.  In any event, this has nothing to do with *Biggers* analysis for the identifications of the defendants.

that Thomas was a "male black, 20s, five nine to five ten, 160 pounds, medium skinned, braids, cornrows, [wearing a] black jacket, bluejeans, and [carrying] a black semiautomatic handgun." (Sept. 11 Tr. 14.)

That is consistent with the description of the defendants Mr. Jean Jacques provided the Court. Mr. Jean Jacques testified that:

- Thomas was taller, and Russell was shorter. (Sept. 24 Tr. 10.)

- Thomas had braids. (Sept. 24 Tr. 10.)[5]

- Russell had two guns, and Thomas had one gun. (Sept. 24 Tr. 11.)

Indeed, the descriptions of the defendants Mr. Jean Jacques provided Detective Jenkins and the Court were substantially accurate. Thomas had braids, and Russell did not. (*See* Government Exhs. 1, 2.) As can be seen in photographs of the defendants taken the day after the January 12, 2012 Home Invasion, Thomas and Russell are black, but Thomas has lighter skin than Russell does. (*See* Government Exhs. 1, 2.) Thomas is taller than Russell.[6] (Sept. 11 Tr. 56.) Thomas is 27, and Russell is 32. (Government Exhs. 1, 2.)

---

[5]     Russell was unsuccessful on cross-examination at convincing Mr. Jean Jacques that it was the *shorter* man who had braids. (*See* Sept. 24 Tr. 24.) Thus, Mr. Jean Jacques confirmed Detective Jenkins's suggestion that the *one* piece of paper describing the shorter man as having braids was a mistake in transcription, corrected when the formal NYPD reports were filed (Sept. 11 Tr. 76-80, 82.)

[6]     Thomas is 5'8", and Russell is 5'4". (*See* Government Exhs. 1, 2.) Mr. Jean Jacques estimated that Thomas was 5'9" to 5'10", and that Russell was 5'7". Thus, while (unsurprisingly), Mr. Jean Jacques's estimations do not exactly match the defendants, they were close to the defendants' true heights. In any event, Mr. Jean Jacques has been unwavering in his observation of the defendants' relative heights. Under these circumstances, and in the context of Mr. Jean Jacques's otherwise accurate descriptions, a discrepancy of no more than three inches does not undermine the reliability of the identification.

Under these circumstances, as with the foregoing Biggers factors, the third *Biggers* factor weighs in favor of the reliability of Mr. Jean Jacques's identification.

### 4.      The Degree of Certainty Demonstrated By the Witness at the Improper Confrontation

With respect to the fourth *Biggers* factor, Mr. Jean Jacques identified both Russell's and Thomas's photographs with absolute certainty.  Mr. Jean Jacques was "100 percent sure" of both identifications when he made them,  (Sept. 24 Tr. 17), and his certainty was corroborated by his language and demeanor during the identification process. (Sept. 11 Tr. 20, 21.)  Under these circumstances, there is no question that he was certain that he had positively identified his attackers.

### 5.      The Length of Time Between the Crime and the Confrontation

Finally, the last *Biggers* factor also supports the reliability of the identification.  The length of time between the January 12, 2012 Home Invasion and the identification in this case - 6 days - is far less than time frames that courts have found to be sufficiently close to support a finding of reliability.  *See*, *e.g.*, *Biggers*, 409 U.S. at 199-201 (seven months between crime and identification sufficiently short to render identification reliable).  Under these circumstances, the brief period between the crime and Mr. Jean Jacques's identification supports the identification's reliability.

For these reasons, the defendants' motions to suppress Mr. Jean Jacques's identifications should be denied.

### B.   The Defendants' Motions to Suppress Ms. Maitland's Identification Should Be Denied

There are two independently sufficient reasons to deny the defendants' motions to suppress Ms. Maitland's identification.  First, as set forth below, the identification was not unduly suggestive because Ms. Maitland already knew the defendants.  Second, even if the identification procedure had been unduly suggestive, the identification would still be independently reliable under *Biggers*. The Government should be permitted to introduce Ms. Maitland's pretrial identification of the defendants, and Ms. Maitland should be permitted to make an in-court identification of the defendants at trial.[7]

### 1.   Ms. Maitland's Identification Was Not Unduly Suggestive

As a preliminary matter, the Court need not reach the *Biggers* test for Ms. Maitland's identification of the defendants because the identification was not "so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law." *DiTommaso*, 817 F.2d at 213 (quoting *Stovall*, 388 U.S. at 302).  Ms. Maitland knew the defendants already; she had seen both of them together before, more than once, and had even sat and talked with Thomas on more than one occasion.  Under these circumstances, the photo identifications were merely confirmatory, and not unnecessarily suggestive.  *See, e.g., Fofanah*, 2012 WL 2674220, at *3 (finding single photo identifications not unnecessarily suggestive where

---

[7]      To be clear, the question of the admissibility of Ms. Maitland's identification is wholly separate from the question of whether the defendants brought the two cellphones to the Furman Avenue Residence.  The latter is a question of fact for the jury, and can be explored by the defendants at trial through cross examination and summation.  For example, counsel can inquire into Ms. Maitland's basis for believing that Thomas dropped off the cellphones.  A separate question is whether Ms. Maitland should be allowed to testify that (1) she has seen Thomas and Russell together on multiple occasions; and (2) the defendants were together, at the Furman Avenue Residence, on the day Ms. Maitland first noticed the cellphones.

witnesses had prior relationships with defendant); *see also Wiggins* v. *Greiner*, 132 Fed. Appx.
861, 865 (2d Cir. May 18, 2005) (summary order) (approving single photograph pre-trial
identification in part because witness had previously seen the defendant and other circumstances
of the crime made his identification sufficiently reliable).  Thus, the identifications are admissible
without additional inquiry into their independent reliability, and "any question as to the reliability
of the witness's identifications goes to the weight of the evidence, not its admissibility."
*Maldonado-Rivera*, 922 F.2d at 973; *see also United States* v. *Santiago*, 174 F. Supp. 2d 16, 31
(S.D.N.Y. 2001) (noting that where Court finds that pretrial identification procedure is not
unduly suggestive, identification testimony may be introduced, and defendant can attack its
credibility before jury).

### 2. Ms. Maitland's Identification of the Defendants Passes the *Biggers* Test

Even if the Court were to find that the identification procedure used for Ms. Maitland was
unduly suggestive, the identification was independently reliable under *Biggers* for the reasons
that follow.

#### a. The Witness's Opportunity to View the Defendants and the Degree of the Witness's Attention

With respect to the first and second *Biggers* factors - the witness's opportunity to view
the defendants and the degree of Ms. Maitland's attention - Ms. Maitland had sufficient
opportunity to view and attend to Thomas and Russell.  She was on her computer at home in the
living room, which is "not that big," (Sept. 24 Tr. 68), and they passed by.  Ms. Maitland did not
simply observe the defendants; they interacted.  She said hello to them, and they said hello back.
(Sept. 24 Tr. 58-59.)  Given that Ms. Maitland *already knew the defendants*, this encounter is

more than sufficient to satisfy the first and second *Biggers* factors.[8]  *See*, *e.g.*, *Wiggins,* 132 Fed. Appx. at 865-66 (finding identification reliable where, among other things, witness saw criminal from 50 feet illuminated by a streetlight, but had seen the criminal in the neighborhood before, and knew his name); *see also Manson*, 432 U.S. at 114; *Raheem*, 257 F.3d at 138; *Wong*, 40 F.3d at 1360; *Salameh*, 152 F.3d at 126-27; *Gonzalez*, 639 F.2d at 847; *Leonardi*, 623 F.2d at 755-56.

### b.      The Accuracy of the Witness's Prior Description

When Detective Jenkins interviewed Ms. Maitland, Ms. Maitland did not provide a description of the defendants, since she quickly identified them from a photograph, so this factor is neutral.

Ms. Maitland did, however, identify Mr. Thomas as "Dwight," and that is, in fact, his alias.

### c.      The Degree of Certainty Demonstrated by the Witness at the Improper Confrontation

The fourth *Biggers* factor - the degree of the witness's certainty - supports the reliability of the identification.  With respect to Ms. Maitland's identification of Thomas, she

---

[8]      Ms. Maitland testified as follows in response to a general question about what had happened the day that the ten men, two of whom she recognized, came to her house: "I don't know exactly what they was doing, as I wasn't paying attention. I just know that they came, and when they left I saw the two cell phones."  (Sept. 24 Tr. 58.)  Ms. Maitland went on, however, to testify that she said hello to the two men - later identified as the defendants - and that they said hello back.  (Sept. 24 Tr. 58-59.)  Given Ms. Maitland's prior history with the defendants, and the fact that she greeted them personally that day, Ms. Maitland's testimony that she was not paying attention to "exactly" what the defendants were doing does not undermine the reliability of her identification.  Indeed, *Biggers* does not require witnesses to pay such exacting attention, even where the witness does not have a prior relationship with the defendant. *See, e.g., Gonzalez* v. *Hammock*, 639 F.2d 844, 847 (2d Cir. 1980) (glance of few seconds at defendant as he pulled shotgun from bag on a street and walked away was "enough of an opportunity to fix an image" of the defendant).  As Ms. Maitland made clear, it is easy to identify people you already know from a glance with a greeting.

"immediately" pointed to Thomas's picture, (Sept. 11 Tr. 27), because she was "sure" that it depicted "Dwight," who had been to the Furman Avenue Residence the night the cellphones had been brought there.  (Sept. 24 Tr. 59-60; *see also* Sept. 11 Tr. 27.).  Likewise, when Detective Jenkins showed Ms. Maitland the photograph of Russell, Ms. Maitland pointed to the photograph and was "direct" when stating: "That's his friend who was with him."  (Sept. 11 Tr. 28.)[9]  Thus, Ms. Maitland expressed a degree of certainty consistent with the reliability of the identification.

### d.      The Length of Time Between the Crime and the Confrontation

The fifth *Biggers* factor - the length of time between Ms. Maitland's seeing the defendants and her viewing the photographs - also demonstrates the reliability of the identifications.  Although Ms. Maitland did not specify the date she believed that the defendants came to the Furman Avenue Residence with the cellphones, the cellphones were stolen during the January 12, 2012 Home Invasion, and traced to the Furman Avenue Residence on January 18, 2012.  Thus, there were, at most, six days between the date Ms. Maitland saw the defendants and the photo identification.  As with Mr. Jean Jacques's identification, this is far less than times that courts have found to be sufficiently close to support a finding of reliability.  *See*, *e.g.*, *Biggers*, 409 U.S. at 199-201 (seven months).

_____

[9]      Although Ms. Maitland clearly stated on direct examination that Russell was with Thomas on the night the cellphones were brought to the Furman Avenue Residence,  (Sept. 24 Tr. 60-61), Ms. Maitland then suggested on cross-examination that she "wasn't really sure that [Russell] was there that night, too. . . ." (Sept. 24 Tr. 67).  To the extent Ms. Maitland is expressing a level of uncertainty now about whether Russell accompanied Thomas to the Furman Avenue Residence, there is no evidence in the record that she expressed it at the time she saw his photograph nine months ago - which is the relevant inquiry under *Biggers*.  In any event, Ms. Maitland's recollections of the night the defendants came to the Furman Avenue Residence can be explored at trial through cross-examination and summation.

Accordingly, the defendants' motions to suppress Ms. Maitland's identifications should be denied.

**V.      Conclusion**

For the foregoing reasons, the Government respectfully requests that the Court deny the defendants' motions to suppress the identification evidence in their entirety.

Dated:           New York, New York
                 October 19, 2012

                                        Respectfully submitted,

                                        PREET BHARARA
                                        United States Attorney for the Southern District of
                                        New York


                          By:     _____/s/_____
                                  Rachel Maimin
                                  Telemachus P. Kasulis
                                  Assistant United States Attorneys
                                  Tel.: (212) 637-2200

23